**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

TERRI WHITEHEAD                                                                                          PLAINTIFF

v.                                              4:08CV00541 JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                                              DEFENDANT

## MEMORANDUM AND ORDER

Plaintiff, Terri Whitehead,[1] has appealed the final decision of the Commissioner of the Social Security Administration denying her claim for continuation of Supplemental Security Income ("SSI"). Both parties have filed Appeal Briefs (Docket entries #8 and #12), and the issues are now joined and ready for disposition.[2]

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997); *see also*, 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[3] "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

---

[1]The application was filed on Plaintiff's behalf by her mother. (Tr. 65-67.) The usual, and better, practice is for this appeal to be brought by the mother, as plaintiff, on behalf of the child. However, under the circumstances of this case, the Court is satisfied that it is not necessary to appoint a guardian ad litem. *See* Fed.R.Civ.P. 17(c).

[2]The parties have consented to the jurisdiction of the Magistrate Judge. (Docket entry #2.)

[3]*Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

*Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

In August of 2002, Plaintiff was found to be disabled because of a severe articulation disorder. (Tr. 149-50.) There is a statutory requirement that eligibility for child disability be periodically reviewed. 20 C.F.R. § 416.944a(a) (2006). Pursuant to such a continuing disability review, Plaintiff was found no longer disabled in August, 2004. (Tr. 45-46.) In December of 2004, a disability hearing officer affirmed the cessation of disability. (Tr. 53-61.)

After conducting an administrative hearing, during which Plaintiff's mother testified, the Administrative Law Judge ("ALJ") concluded that Plaintiff had not been under a disability,[4] within the meaning of the Social Security Act, at any time after August of 2004. (Tr. 21.) On April 15, 2008, the Appeals Council received and considered additional evidence and then denied Plaintiff's request for a review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 4-7.) Plaintiff then filed this appeal. (Docket entry #1.)

At the time of the administrative hearing, Plaintiff was seven years old. (Tr. 15, 16.) She had just finished the first grade. (Tr. 268.) The Social Security Administration has prescribed a three-step sequential evaluation for making a periodic review of a child's eligibility for disability benefits. 20 C.F.R. § 416.994a(b) (2006). First, it must be determined if there has been any "medical improvement" in the child's condition. *Id.* at § 416.994a(b)(1). Medical improvement is defined as "any decrease in the medical severity of [the child's] impairment(s) which was present at the time of the most recent favorable decision that [the child] w[as] disabled or continued to be disabled . . . based on changes (improvement) in the symptoms, signs, or laboratory findings associated with [the child's] impairment(s)." *Id.* at § 416.994a(c). If there has been no medical

---

[4] An individual under the age of 18 shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i) (1996).

improvement, the child continues to be disabled (unless exceptions not applicable here apply). *Id.* § 416.994a(b)(1).

Second, if there has been medical improvement, it must be determined whether the impairment(s) that was considered at the time of the most recent favorable determination or decision still meets or equals the severity of the Listed impairment it met or equaled at that time. *Id.* at § 416.994a(b)(2). If the impairment does, the child's disability will be found to continue (unless exceptions not applicable here apply). *Id.* If the impairment does not, the sequential evaluation will proceed to the next step. *Id.*

Third, it must be determined whether the child is currently disabled under the rules for determining eligibility in initial disability claims for children. *Id.* at § 416.994a(b)(3).

In determining whether an SSI claimant under the age of 18 is under a disability, a three-step sequential evaluation process is used which is comparable to the five-step sequential evaluation process utilized for adults. 20 C.F.R. § 416.924(a) (2006).

The first step is a determination whether the child is engaged in substantial gainful activity. *Id.*, § 416.924(b). If so, benefits are denied; if not, the evaluation continues to the next step.

The second step involves a determination whether the impairment or combination of impairments is severe, *i.e.*, more than a slight abnormality that causes no more than minimal functional limitations. *Id.*, § 416.924(c). If not, benefits are denied; if so, the evaluation continues.

The third step involves a determination whether the child has impairment(s) that meet, medically equal, or functionally equal in severity a Listed impairment. *Id.*, § 416.924(d). If so, and if the duration requirement is met, benefits are awarded; if not, benefits are denied.

The ALJ found that Plaintiff: (1) had never engaged in substantial gainful activity (Tr. 16); (2) did have "severe" impairments, a specific learning disability, significant delays in visual motor skills and motor coordination skills, and receptive and expressive language delays (*id.*); but (3) did not have any impairment or combination of impairments that met or medically equaled a Listing or that functionally equaled a Listed impairment. (Tr. 16-20.) Consequently, he found that she was no

longer disabled.  (Tr. 20.)

In her Appeal Brief, Plaintiff argues that the ALJ erred: (1) by not finding that she had "marked" impairments in the domains of acquiring and using information and moving about and manipulating objects;[5] (2) by not fully and fairly developing the record regarding her attention deficit hyperactivity disorder ("ADHD"); and (3) by reaching a decision not supported by substantial evidence.  Because the Court finds that Plaintiff's second argument has merit, the other two arguments need not be discussed.

Plaintiff contends that the ALJ failed in his duty to fully and fairly develop the record regarding her ADHD.  (*Pltff.'s App. Br.* at 12-13.)  Plaintiff's mother proceeded without representation at the administrative hearing.  (Tr. 260-65.)  The ALJ has a duty to fully and fairly

---

[5]Since Plaintiff had a "severe" impairment, but it did not meet or medically equal a Listing, it was necessary for the ALJ to determine if the impairment functionally equaled a Listing.  20 C.F.R. § 416.926a(a) (2006).

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the Welfare Reform Act), P.L. 104-193, 110 Stat. 2105 (codified in scattered sections of 42 U.S.C.), required implementing regulations.  One significant change that the final regulations made from the interim final regulations is the manner of determining functional equivalence.  There is now a single method of evaluating functional equivalence based only on domains of functioning.  Under this regulation, an impairment is functionally equivalent to a Listing when the impairment results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning. *Id.*

A "marked" limitation in a domain seriously interferes with a child's ability to independently initiate, sustain or complete activities.  20 C.F.R. § 416.926a(e)(2) (2006).  It also means a limitation that is "more than moderate" but "less than extreme."  *Id.*  It is the equivalent of functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.  *Id.*

An "extreme" limitation in a domain very seriously interferes with a child's ability to independently initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(3) (2006). "Extreme" limitation also means a limitation that is "more than marked."  *Id.*  It is the rating given to the worst limitations.  *Id.*  It is the equivalent of functioning expected on standardized testing with scores that are at least three standard deviations below the mean.  *Id.*

    The domains of functioning are:
    1) Acquiring and using information;
    2) Attending and completing tasks;
    3) Interacting and relating with others;
    4) Moving about and manipulating objects;
    5) Caring for yourself; and
    6) Health and physical well-being.
20 C.F.R. § 416.926a(b)(1)(i-vi) (2006).

These domains are described in greater detail, with examples, in the regulations.  20 C.F.R. § 416.926a(g)-(l) (2006).

develop the record, even in cases where the claimant is represented by counsel. *E.g., Bishop v. Sullivan*, 900 F.2d 1259, 1262 (8th Cir. 1990). That duty is even greater where, as here, the claimant is not represented by counsel at the hearing. *E.g., Salts v. Sullivan*, 958 F.2d 840, 844 (8th Cir. 1992).

There was considerable discussion of Plaintiff's ADHD during the hearing:

Q . . . . Now since that time there is an additional allegation, I take it, that she has ADHD?

A  Okay.

Q  And that was addressed by Dr. Whaley, who did a review on 10/25/04, October of '04, and his assessment was that she had some difficulty in interacting and relating with others. Now you have indicated to me that there are some records over at the school that may cast some light on this?

A  Yes, Your Honor.

Q  And we will take a look at that. That may give us a little better picture. But let me just ask you a little bit about that. First of all, do you think that her language has improved some?

A  No, sir. She is still doing it.

Q  You don't think so?

A  She still doing speech. She do.

Q  She is doing speech therapy?

A  Uh-huh. Occupational therapy and she do the little speech, and she also on resource because she cannot manage with the regular classes.

Q  All right.

A  So she have to do one on one.

Q  She is in first grade?

A  Yes, sir.

Q  She just finished first?

A  She barely made it to the first. Well, she is going to the second now due to her being in resource.

Q  All right.

A  And they continue. She got to continue resource until she graduates.

Q  All right. Let me ask you about the ADHD. Is she having trouble with the teachers, or classmates, or both?

A  Both.

Q  All right. Does she talk out? Does she talk out of turn and get up out of her chair, and roam around?

A  She is constantly moving, and she do it at home because we're in the process of setting her up to get her on some medication and stuff.

Q  Who has diagnosed her as having ADHD?

A  She was tested through the school when they do their review, and the reports and stuff, like the teacher have to do that eval. The teacher is the one that discovered it, and we ended up --

Q  All right. Do you all live in Jacksonville?

A  Yes, sir.

Q  Will they refer you to a psychologist/psychiatrist to see?

A  They recommended me to Children Hospital, and we in the process of getting her an appointment so we can go and finish the process now on getting her started on what she has got to do to get on medication.

Q  And when did the school determine that she had ADHD? When did they do the testing?

A  Right before she got out of school for summer break.

Q  Okay. A few weeks ago?

A  Yes, sir.

Q  All right. They are indicating that you need to go to Children's to see if they can possibly determine there is some drug to give her?

A  Yes, sir.

Q  Okay.

A  We have a hard time getting —

Q  There are a lot of drugs for ADHD, and I can tell you my experience has been in doing this that most of those drugs, if the child is compliant with the drugs helps. Sometimes they will put them on a drug that does not help, and they will be able to adjust it. But once they find the drug, then those drugs help, and not all the time but more often than not. So maybe that will give you some relief.

      A  Even her doctor recommends.  We was at a visit and he cannot get her to be still long enough for him to do a regular check-up, and he asked me has she ever --

      Q  Okay.  Is that the way she is at home?

      A  That is the way she is at home.  She is just constantly moving.  I don't even have to give her any candy or anything.  She just won't, it is just how she is period.

      Q  She is just hyper all the time?

      A  Yes, sir.

      Q  All right.  Now how about her overall mood?  Does she —

      A  She struggles with reading.  We worked with her on that.  She is still struggling.  I'm sorry.

      Q  Okay.  And you think she is a slow learner?

      A  She has had, well, she think on the average of a 5 or a 6 year old.  She not thinking on the same level of her age.  She sometime go back into a mode of a chair.  Like now we still deal with her motors like getting her to learn how to eat with her utensils.  She still tends to not use them.

      Q  She wants to eat with her hands?

      A  Yes, sir.  And she was doing it when she was a child too.

      Q  Is she defiant?  Does she sass you?  She won't do what you tell her, that sort of thing, or it is just that she is hyper?  I mean, does she try to do what you want her to do?

      A  She try to but she mainly understand if we show it, demonstrate.  But we try to tell her she seem like she is not.  She just sit there sometime and won't respond.

      Q  But it is more like she doesn't understand?

      A  Yes, sir.

      Q  It is not that she is up in your face saying I ain't going to do it?

      A  No, sir.  None of that.

      Q  I'm not going to do it.  All right.  Well, there is a big difference there.

      A  Yes, sir.

      ALJ:  And your problems could be compounded.  I mean, I see a lot of kids that way too.  Well, all right.  You are going to get the school to send us the records?

      WIT:  Yes, sir.  As a matter of fact, I can pick them up and bring them to you

>all. They just been waiting on me.
>
>ALJ: You can mail them. They will give you the address up[ ]front, or you can bring them by if that is what you want to do.
>
>WIT: Yes, sir. Because I be up this way hanging out at Vic Snyder's office.
>
>ALJ: Just bring them in there where you were sitting.
>
>WIT: Yes, sir.
>
>ALJ: And usually the big fella with the deadlocks is sitting there behind the table, and you can give them to him. But it doesn't matter. There will be somebody there, and they will put them in the file. But yeah, the sooner the better on that.
>
>WIT: Yes, sir.
>
>ALJ: And I'll take a look at that, and then really anything you have got over there. Have you got an appointment at Children's?
>
>WIT: They are in the process of setting her an appointment as soon as possible once they can get an opening. They said being tested for ADD and stuff like that they be so overwhelmed.
>
>ALJ: They're backed up. I'm sure.
>
>WIT: Yeah. So I'm just waiting on them to get her an opening.
>
>ALJ: All right. Well, I'll say let's hold the record open here for the school records.
>
>WIT: Yes, sir.
>
>ALJ: So we want to put that in post, and I will take a look at that.

(Tr. 267-72.)

However, her ADHD barely rated a mention in the ALJ's opinion:

>The record also shows a less than marked limitation in attending and completing tasks. On October 8, 2004, the examining physician noted signs and symptoms of ADHD in addition to the history of global delays and persistent language problems and cognitive delay. However, the child has demonstrated no behavior problems at school and appears to have benefit[t]ed from occupational therapy, speech therapy, and academic support. She has had no problems with school attendance.

(Tr. 19-20.)

The ALJ's error in failing to consider Plaintiff's ADHD occurred despite his acknowledgment in his opinion that Anthony D. Johnson, M.D., noted signs and symptoms of

ADHD when he examined Plaintiff. (Tr. 239.) It occurred despite testimony that testing a few weeks before at school revealed ADHD and resulted in a referral to Arkansas Children's Hospital for testing and medication. (Tr. 268-69.) It occurred despite a recommendation from Plaintiff's treating physician that she be tested for ADHD. (Tr. 270.) It occurred despite a discussion between the ALJ and Plaintiff's mother during the hearing about drug treatment for ADHD. Under these circumstances, the ALJ unquestionably should have held open the record for the results of testing for ADHD at Arkansas Children's Hospital or Plaintiff should have been referred to a consultative examination to determine if she had ADHD and, if so, could medication help. Thus, the Court concludes that the ALJ failed to adequately develop the record in regard to ADHD.

Finally, in discussing her limitations in the domain of moving about and manipulating objects, the ALJ observed, " . . . but the child was expected to benefit significantly from occupational therapy services . . . ." The ALJ is reminded that his *speculation* does *not* amount to substantial evidence. *See Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir. 1997) (speculation that disease may become worse, without more, is not sufficient to show plaintiff was disabled at the time the opinion was rendered).

Based on these errors and the record as a whole, the Court finds that the ALJ's decision is not supported by substantial evidence, and, for that reason, it must be reversed and the matter remanded for a reevaluation of Plaintiff's complaints regarding ADHD. This is a "sentence four" remand within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

IT IS SO ORDERED this 23rd day of September, 2009.

_____
UNITED STATES MAGISTRATE JUDGE